No. 23-60361

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

––––––––

RICHARD ALLEN DUFOUR, JR.,

*Plaintiff-Appellant*

v.

BP Exploration & Production Inc. and BP America Production Company

*Defendants-Appellees*.

––––––––

Appeal from the United States District Court for the Southern District of
Mississippi
U.S.D.C. Case No. 1:19-CV-00591
The Honorable Halil S. Ozerden
United States District Judge

––––––––

## BRIEF OF PLAINTIFF-APPELLANT RICHARD ALLEN DUFOUR, JR.

––––––––

SUBMITTED BY:

MARTHA Y. CURTIS (La. Bar #20446)
HANNAH L. BREWTON (La. Bar #40178)
**SHER GARNER CAHILL RICHTER
KLEIN & HILBERT, L.L.C.**
909 Poydras Street, Suite 3800
New Orleans, Louisiana 70112-4046
Telephone: (504) 299-2100
Facsimile: (504) 299-2300

i

## CERTIFICATE OF INTERESTED PERSONS

Appellant certifies that the following listed persons and entities as described in the fourth sentence of the United States Court of Appeals for the Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case.  These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1) **Appellant-Plaintiff:**

Richard Allen DuFour, Jr. ("DuFour"), a natural person of the age of majority and a citizen and resident of Jackson County, Mississippi.

2) **Counsel for Appellant-Plaintiff:**

Martha Y. Curtis
Hannah L. Brewton
SHER GARNER CAHILL RICHTER KLEIN & HILBERT, L.L.C.
909 Poydras Street, Suite 2800
New Orleans, Louisiana 70112-4046
(504) 299-2100

C. David Durkee
THE DOWNS LAW GROUP, PA
3250 Mary Street, Suite 307
Coconut Grove, Florida 33133
(305) 444-8226

Terris Caton Harris
THE COCHRAN FIRM  - JACKSON, LLC
197 Charmant Place, Suite 2
Ridgeland, MS 39157
(601) 790-7600

**3) Appellees-Defendants:**

BP Exploration & Production, Incorporated; BP America Production Company (collectively, "BP Defendants"). Both BP Defendants are incorporated in Delaware, with their principal place of business in Houston, Texas.

**4) Counsel for Appellees-Defendants:**

Devin Chase Reid
LISKOW & LEWIS APLC
701 Poydras St #5000, New Orleans, LA 70139
(504) 581-7979

Aaron Lloyd Nielson
George W. Hicks, Jr.
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue NW
Washington, DC 20004
(202) 879-5000

Cecelia Virden
MARON MARVEL BRADLEY ANDERSON & TARDY, L.L.C.
1020 Highland Colony Parkway, Suite 400
Ridgeland, MS 39157

Dated: October 12, 2023

*S/ Martha Y. Curtis*

_____

**MARTHA Y. CURTIS**
**ATTORNEY OF RECORD FOR**
**RICHARD ALLEN DUFOUR, JR.**

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Plaintiff-Appellant, Richard Allen DuFour, Jr. ("DuFour"), respectfully submits that oral argument will assist this Court in deciding the issues presented by the parties in this appeal.

# **TABLE OF CONTENTS**

JURISDICTIONAL STATEMENT ..........................................................................1

STATEMENT OF ISSUES ...................................................................................3

STATEMENT OF THE CASE................................................................................4

   I.  MR. RICHARD ALLEN DUFOUR, JR. ....................................................4

  II.  THE HARMFUL CHEMICALS RESULTING FROM
THE DEEPWATER HORIZON OIL SPILL AND ITS
RESPONSE ACTIVITIES .............................................................................4

 III.  PROCEDURAL BACKGROUND/THE MEDICAL
BENEFIT CLASS ACTION SETTLEMENT
AGREEMENT................................................................................................6

 IV.  DUFOUR'S EXPOSURE TO TOXINS RESULTING
FROM THE OIL SPILL.................................................................................7

  V.  THE *DAUBERT* MOTIONS AND MOTION FOR
SUMMARY JUDGMENT..............................................................................8

SUMMARY OF THE ARGUMENT ....................................................................11

ARGUMENT ......................................................................................................12

   I.  STANDARD OF REVIEW AND MOTION FOR SUMMARY
JUDGMENT STANDARD...........................................................................12

  II.  THE *DAUBERT* STANDARD AND COURTS AS
GATEKEEPERS ..........................................................................................13

 III.  THE DISTRICT COURT ABUSED ITS DISCRETION IN
EXCLUDING CAUSATION TESTIMONY OF DRS.
FREEMAN AND FRENCH WITHOUT HOLDING A
*DAUBERT* HEARING.................................................................................16

A. Standard for Granting *Daubert* Hearings ........................................16

B. This complex case required a *Daubert* hearing regarding the expert opinions on causation. ...................................18

IV. THE DISTRICT COURT ABUSED ITS DISCRETION IN EXCLUDING THE EXPERT TESTIMONY OF DR. FREEMAN. ..............................................................................................20

    A. The District Court went beyond its gatekeeping function in its assessment of the studies relied upon by Dr. Freeman. ....................................................................................20

        i. The Lawrence Study .............................................24

        ii. The NIOSH Data...................................................27

    B. The District Court applied an inflated standard for causation ...........................................................................................28

V. THE DISTRICT COURT ABUSED ITS DISCRETION IN EXCLUDING DR. FRENCH'S TESTIMONY REGARDING CAUSATION OF HIS PATIENT'S CONDITION AS PLAINTIFF'S TREATING PHYSICIAN ...............................................33

VI. THE DISTRICT COURT ERRED WHEN IT GRANTED THE SUMMARY JUDGMENT AND DISMISSED DUFOUR'S CASE ..........................................................................................................37

CONCLUSION....................................................................................................38

CERTIFICATE OF SERVICE ................................................................40

CERTIFICATE OF COMPLIANCE........................................................41

CERTIFICATE OF ELECTRONIC COMPLIANCE.............................42

# TABLE OF AUTHORITIES

## CASES

*Allen v. Pennsylvania Engineering Corporation*
    102 F.3d 194 (5th Cir. 1996) ...................................................................31, 38

*Beau Rivage Resorts, Inc. v. Bel-Aire Products, Inc.*
    No. 1-07CV49, 2010 WL 579937 (S.D. Miss. Feb.12, 2010) ......................16

*Cantu v. Wayne Wilkens Trucking, LLC*,
    No. 19-7067, 487 F.Supp.3d 578 (W.D. Tex. Sept. 16, 2020)......................35

*Carlson v. Bioremedi Therapeutic Systems. Inc.*
    822 F.3d 194 (5th Cir. 2016) ........................................................................16

*Celotex Corp. v. Catrett*
    477 U.S. 371 (1986)......................................................................................13

*Daubert v. Merrel Dow Pharmaceuticals, Inc.*
    509 U.S. ...................................................................................................*passim*

*Harrison v. BP Exploration & Production Inc*.,
    No. 17-4346, 2022 WL 2390733 (E.D. La. July 1, 2022).............................15

*Heinsohn v. Carabin & Shaw, P.C.*
    832 F.3d 224 (5th Cir. 2016) ........................................................................12

*In re: Deepwater Horizon B-3 cases*
    No. 17-03188, Doc. 63 (E.D.La. Oct. 12, 2022) ...........................................32

*James v. Antarctic Mechanical Servs., Inc.*
    No. 18-678, 2020 WL 1339640 (S.D. Miss. 3/23/2020)........................34, 35

*Johnson v. Arkema, Inc.*
    685 F.3d 452 (5th Cir. 2012) ........................................................................23

*Knight v. Kirby Inland Marine, Inc.*
    482 F.3d 347 (5th Cir. 2007) ...................................................................*passim*

*Kumho Tire Co. v. Carmichael*
  546 U.S. 137 (1999)......................................................................................32

*Lee-Bolton v. Koppers Inc.*
  319 F.R.D. 346 (N.D. Fla. 2017).................................................................20

*Meditrust Financial Services Corporation v. Sterling Chemicals, Inc.*
  168 F. 3d 211 (5th Cir. 1999).......................................................................12

*Perez v. Boecken*
  No. 19-00375, 2020 WL 3074420 (W.D. Tex June 10, 2020).......................36

*Person v. Ford Motor Company*
  No. 09-133, 2011 WL 10501606 (N.D. Miss. Oct. 13, 2011) ..............*passim*

*Pipitone v. Biomatrix, Inc*.
  288 F.3d 239 (5th Cir. 2002).................................................................21, 22

*Plancun v. BP Exploration & Production, Inc.*
  No. 15-2963, 2016 WL 7187946 (E.D. La. Dec. 12, 2016).........................28

*Roman v. Western Manufacturing., Inc*.
  691 F.3d 686 (5th Cir. 2012).......................................................................12

*Sanger Insurance Agency v. HUB International Ltd*.
  802 F.3d 732 (5th Cir. 2015).......................................................................17

*Seaman v. Seacor Marine, LLC*
  326 F. App'x 721(5th Cir. 2009)..................................................................37

*United States v. 14.38 Acres of Land, More or Less Situated in
Leflore County., State of Mississippi*
  80 F.3d 1074 (5th Cir. 1996)..................................................................14, 18

*United States v. Williams*
  No. 20-10433 (5th Cir. 2021) 2021 WL 2819016.........................................36

*Urbano v. Continental Airlines, Inc.*
  138 F. 3d 204 (5th Cir. 1998 .......................................................................12

*Viterbo v. Dow Chemical Co*.
   826 F.2d 420 (5th Cir. 1987) .......................................................................23

*Wackman v. Rubsamen*
   602 F.3d 391 (5th Cir. 2010) .......................................................................23

*Williams v. Manitowoc Cranes, L.L.C.*
   898 F.3d 607 (5th Cir. 2018) .......................................................................12

## **OTHER**

FED. R. EVID. 702 ...............................................................................13, 15

FED. R. EVID. 703 ..............................................................................................33

FED. R. CIV. PRO. 26............................................................................................33

FED. R. CIV. PRO. 54..............................................................................................2

FED. R. CIV. PRO. 56(C) ......................................................................................13

28 U.S.C. § 1291 ..................................................................................................2

28 U.S.C. § 1331 ..................................................................................................1

28 U.S.C. § 1332 ..................................................................................................1

28 U.S.C. § 1333 ..................................................................................................1

46 U.S.C. § 30101 ................................................................................................1

LOC. UNIF. CIV. R. S.D. MISS. 26(a)(2)(D). ..........................................................34

Austin Bradford Hill, *The Environment and Disease: Association or Causation*.
Proc. Roy. Soc. Med. 58 295, 299 (1965) .............................................................29

Margaret A. Berger, *The Admissibility of Expert Testimony*, in Reference
   Manual on Scientific Evidence 29 (Fed. Jud. Ctr., 2d ed., 2000) ...........26, 32

## JURISDICTIONAL STATEMENT

Jurisdiction exists over this litigation arising out of the *Deepwater Horizon* oil spill—an accident on the Outer Continental Shelf—under 28 U.S.C. § 1332, because all the parties are diverse in citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs. ROA. 51. Additionally, this Court has jurisdiction under 28 U.S.C. § 1331 based on Federal Question for the federal judiciary to hear all cases of admiralty and maritime jurisdiction. ROA. 51. Finally, this Court has jurisdiction under 28 U.S.C. § 1333 and 46 U.S.C. § 30101 which extends the admiralty and maritime jurisdiction of the United States to "cases of injury or damage, to person or property, caused by a vessel on navigable waters, even though the injury or damage is done or consummated on land." ROA. 51.

The United States District Court for the Southern District of Mississippi was also the proper venue in this matter, as this case arises from the "Back-End Litigation Option" ("BELO") process described in the Medical Benefits Class Action Settlement Agreement ("MSA") entered into by the BP Defendants and the Class. ROA. 51. The MSA was approved by Judge Barbier of the Eastern District of Louisiana, who oversees the *Deepwater Horizon* MDL, and has continuing and exclusive jurisdiction over the MSA. For physical conditions diagnosed after April 16, 2012, the MSA provides for BELO litigation in the United States District Court for the Eastern District of Louisiana. MSA § VIII.

Pursuant to the terms contained in the MSA's BELO provisions, DuFour sued the BP Defendants in the Eastern District of Louisiana.  ROA. 51.  The parties stipulated, as provided for in the MSA's BELO provisions, that the appropriate venue for proceedings in this case is the Southern District of Mississippi. ROA. 152. This case was then transferred to the Southern District of Mississippi for the convenience of the parties and witnesses, as the interest of justice warranted. ROA. 152.

This Court has jurisdiction over this Appeal pursuant to Federal Rule of Civil Procedure 54 and 28 U.S.C. § 1291 because it is an appeal of a final judgment entered by the District Court.  ROA. 9662.  On June 2, 2023, the District Court issued a final and appealable judgment dismissing DuFour's claims against BP with prejudice (the "Judgment") ROA. 9662.  On June 30, 2023, DuFour filed a timely notice of appeal of the Judgment.  ROA. 9663-9664.

## STATEMENT OF ISSUES

1. Whether the District Court abused its discretion in denying Plaintiff's motion for a *Daubert* Hearing before excluding Plaintiff's experts.

2. Whether the District Court was clearly erroneous when it excluded Plaintiff's experts, where those experts relied on proper methodology and data and were necessary to prove the necessary elements of legal causation, including the level and extent of exposure to harmful chemicals required in a toxic tort case.

3. Whether, because of the erroneous granting of the BP Defendants' Motion to Exclude expert testimony, the District Court erred in granting Defendants' Motion for Summary Judgment, dismissing this lawsuit in its entirety.

## STATEMENT OF THE CASE

### I.     MR. RICHARD ALLEN DUFOUR, JR.

This Appeal arises from litigation for damages sustained from Clean-Up Worker Richard Allen DuFour, Jr.'s exposure to harmful chemicals from responding to the BP Oil Spill. ROA. 54. As a result of the response efforts following the BP Oil Spill and DuFour's exposure to harmful chemicals, DuFour suffered permanent injuries. ROA. 55. On March 30, 2016, DuFour was diagnosed with Work Related Asthma Secondary to Oil Spill Exposure and Worsening or an Aggravation of the Preexisting Condition of Asthma. ROA. 310.

### II.     THE HARMFUL CHEMICALS RESULTING FROM THE DEEPWATER HORIZON OIL SPILL AND ITS RESPONSE ACTIVITIES

The Deepwater Horizon Rig (the "DHR") was an oil-drilling rig on the outer continental shelf in the Gulf of Mexico. ROA. 52. On April 20, 2010, the blowout of the Macondo Well, drilling by the DHR on the Outer Continental Shelf of the Gulf of Mexico located on the Mississippi Canyon, resulted in explosions and fire on board the DHR. ROA. 52. Crude Oil flowed from the damaged Mississippi Canyon 252 well (the "MC252 well"). Following the explosion, Crude Oil and other hydrocarbons were released from the MC252 well (the "MC252 oil"). ROA. 52. The oil released contained other volatile organic compounds ("VOCs") such as ethylbenzene, toluene, xylene and naphthalene; polycyclic aromatic hydrocarbons

("PAHs"); diesel fumes, and heavy metals such as aluminum, cadmium, nickel lead, and zinc. ROA. 52.

After the explosions, response activities were performed by Clean-Up Workers under the direction of Unified Command. ROA. 53. As part of the response activities, the BP Defendants purchased highly noxious chemical dispersants from NALCO and/or its subsidiaries which were sprayed over large areas, including Corexit®9500A and Corexit® EC9527A (collectively referred to as "Dispersants"). ROA. 53.

According to the Material Safety Data Sheets ("MSDS"),[1] the Dispersants are eye and skin irritants, containing hazardous substances that are harmful to human health. ROA. 53. Dermal exposure, inhalation, and ingestion of Corexit® EC 9500 should be avoided. ROA. 53. If inhaled, the Dispersants may irritate the respiratory tract. ROA. 53. If ingested, Corexit® EC9527A may cause liver and kidney effects and/or damage or irritate the gastrointestinal tract. ROA. 53. Acute exposure may cause adverse central nervous system effects, nausea, vomiting, and anesthetic or narcotic effects. ROA. 53.

Corexit® EC9527A contains 2-butoxyethanol ("2-BE"). ROA. 53. The chemical 2-BE is an eye, nose, and throat irritant that can cause nausea, vomiting,

---

[1] A "data sheet" is a form that sets forth the properties of a particular substance, including its toxicity and health effects.

diarrhea, and abdominal pain.  ROA. 53.  Repeated or excessive exposure to 2-BE may cause injury to red blood cells, the kidneys, and the liver.  ROA. 53.  Exposure to 2-BE can also cause headaches, dizziness, lightheadedness, and unconsciousness. ROA. 53.  Exposure to 2-BE can damage a developing fetus, and chronic exposure may result in damage to the male and female reproductive systems in animals. ROA. 53.

The Dispersants also contain non-specified organic sulfonic acid salt, which is "moderately toxic," as well as propylene glycol, a chemical with solvent properties.  ROA. 53-54.  Propylene glycol is a mild irritant and exposure to high levels can cause eye, nose, throat, and lung irritation.  ROA. 54.  Some individuals are allergic to propylene glycol and those with eczema may be at a higher risk ROA. 54.  Exposure may cause erythema, edema, induration, and other skin problems. ROA. 54.

## III.  PROCEDURAL BACKGROUND/THE MEDICAL BENEFIT CLASS ACTION SETTLEMENT AGREEMENT

This litigation arises out of the Medical Benefits Class Action Settlement Agreement (the "MSA") filed in the *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010* (commonly referred to as "MDL 2179").  ROA. 1218.  On January 11, 2013, District Judge Carl J. Barbier approved the MSA that comprised of individuals who, among other things, were Clean-Up Workers.  ROA. 1218-1219, 9623.

6

While class members who did not opt out of the MSA surrendered their rights to sue BP for medical conditions, the MSA carved out an exception known as a "Back-End Litigation Option" ("BELO") procedure to permit class members who did not opt out to sue the BP Defendants for claims with dates of first medical diagnosis after April 16, 2012. ROA. 1219. The BP Defendants have stipulated to fault and are responsible for any and all damages that were proximately caused as a result of this event, including damages caused to class members who allege a Later Manifested Physical Condition ("LMPC") under the BELO lawsuits. ROA. 307, 9624.

## IV.    DUFOUR'S EXPOSURE TO TOXINS RESULTING FROM THE OIL SPILL

DuFour was a "Clean-Up Worker" within the scope of the MSA. *See* ROA. 54. DuFour's duties as a Clean-Up worker included performing shoreline cleanup and boom decontamination. ROA. 54. Through these duties, DuFour was exposed through inhalation, airborne, and direct contact to oil, Dispersants, and other harmful chemicals throughout the duration of his time as a Clean-Up Worker. ROA. 54-55. On more than one occasion, DuFour was exposed to oil, Dispersants, and harmful chemicals when his eyes, nose, mouth, and skin were exposed due to the lack of proper protective equipment ("PPE"). ROA. 55. As a result of DuFour's exposure to these chemicals, DuFour suffered serious permanent injuries. ROA. 55.

7

On March 30, 2016, DuFour was diagnosed with Work Related Asthma Secondary to Oil Spill Exposure and Worsening or an Aggravation of the Preexisting Condition of Asthma. ROA. 310. DuFour also developed a reasonable fear that in the future he may develop a severe disease, injury, or illness, including, but not limited to, cancer arising out of, resulting from, and/or relating to his LMPC. ROA. 311.

On March 6, 2019, DuFour timely filed suit in the Eastern District of Louisiana. ROA. 50-56.  DuFour sued the BP Defendants, claiming that his permanent injuries were legally and proximately caused by his exposure to oil, dispersants, and other harmful chemicals from the Oil Spill.  ROA. 55.

On August 29, 2019, DuFour and the BP Defendants jointly filed a statement regarding venue, stipulating that the appropriate venue for proceedings in this matter was the Southern District of Mississippi, for the convenience of the parties and in the interest of justice.  ROA. 148. Magistrate Judge Joseph C. Wilkinson, Jr. subsequently ordered reallocation of this matter to the Southern District of Mississippi.  ROA. 152.

## V.    THE *DAUBERT* MOTIONS AND MOTION FOR SUMMARY JUDGMENT

On January 6, 2023, the BP Defendants filed a Motion to Exclude the Opinions of Plaintiff's Expert Dr. Michael Freeman. ROA. 2460. The BP Defendants argued that Dr. Freeman did not meet the requirements to opine on

causation in the present toxic tort case because Dr. Freeman did not identify a quantitative dosage of harmful chemicals to which DuFour was exposed. In response, DuFour argued that BP erroneously attempted to create a higher standard than legally required by alleging that Plaintiff's experts are required to identify a numerical dosage of exposure to a harmful chemical that is necessary to cause harm in the general population. ROA. 8576.

Also on January 6, 2023, the BP Defendants filed a Motion to Exclude Certain Opinions of Dr. Shawn K. French. ROA. 3737. The BP Defendants argued that the testimony of Dr. French, a treating physician of DuFour, should be limited to the contents of his medical records. In response, DuFour argued that treating physicians, such as Dr. French, can testify regarding causation outside of the four corners of their patient's medical records, and that any challenge to this testimony should go to the *weight of the opinions*, *not* to the admissibility of the opinions. ROA. 6021.

On February 10, 2023, DuFour filed a motion to set a date for an Evidentiary Hearing, *i.e.*, a *Daubert* Hearing, in order to present live expert testimony of the Plaintiff's experts being challenged by the BP Defendants. ROA. 9490. The District Court denied this request to set a *Daubert* Hearing and granted the BP Defendants' to exclude the testimony of Drs. Freeman and French without hearing live testimony from the experts themselves. ROA. 9632.

In excluding Plaintiff's expert epidemiologist Dr. Freeman, the District Court erroneously conflated the separate standards required for a plaintiff to satisfy the *general* and *specific* causation requirements in toxic tort cases. Further, the District Court went beyond its gatekeeping function under *Daubert* by noting alleged weaknesses of studies relied upon by Dr. Freeman to exclude him while ignoring the asserted strengths of the studies. Such an analysis of the weighing of strengths and weaknesses of studies on which an expert relies is a job reserved for a jury, not the District Court.

In excluding testimony by Plaintiff's *treating physician* Dr. French, the District Court stated that Dr. French could not opine on what caused DuFour's health conditions because he was not designated as an expert and did not submit an expert report. ROA. 9649. However, any issues regarding Dr. French's medical testimony do not support complete exclusion of any opinions he had regarding causation of his patient's health conditions. Such issues properly go to the weight and credibility of Dr. French's testimony, *not* the admissibility. The District Court erred in excluding Dr. French's causation testimony completely.

After excluding Plaintiff's expert witnesses, DuFour was then unable to demonstrate the causation element of his claim. ROA. 9660. The District Court then dismissed DuFour's claims against the BP Defendants in their entirety. ROA. 9662.

## SUMMARY OF THE ARGUMENT

The District Court abused its discretion when it denied DuFour's Motion for *Daubert* Hearing and excluded the causation testimony of Dr. Freeman and Dr. French on the papers without allowing an evidentiary hearing or live testimony from the doctors. Additionally, the District Court erred in excluding the testimony of Dr. Freeman, relying on an inflated and incorrect standard for what constitutes a reliable opinion on the level of exposure required to prove causation in toxic tort cases. Further, the District Court procedurally went beyond its judicial gatekeeping role by weighing the usefulness of an epidemiologic study relied upon by Dr. Freeman.

The District court also erred in excluding the causation testimony of Plaintiff's treating physician Dr. French, as any issue regarding such testimony as to what caused his patient's condition that he was treating should be weighed by the trier of fact as to the credibility of the testimony, and not by the Court solely on written submissions.

Finally, by striking any opinions regarding causation, the District Court denied DuFour a reasonable opportunity to oppose BP's Motion for Summary Judgment.    As such, this Court should reverse the judgment dismissing DuFour's claims and remand the case for further proceedings.

## ARGUMENT

## I.    STANDARD OF REVIEW AND MOTION FOR SUMMARY JUDGMENT STANDARD

An appellate court reviews the district court's admission or exclusion of expert testimony for an abuse of discretion. *Williams v. Manitowoc Cranes, L.L.C.*, 898 F.3d 607, 614-15 (5th Cir. 2018); *see also Roman v. W. Mfg., Inc*. 691 F.3d 686, 692 (5th Cir. 2012). This Court will not find that the district court abused its discretion unless the ruling is manifestly erroneous. *Id*. "A district court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence." *Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 233 (5th Cir. 2016). A judgment is reversed if the error is one where "the ruling affected substantial rights of the complaining party." *Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 351 (5th Cir. 2007).

Further, an appellate court reviews the District Court's ruling on a summary judgment *de novo*. *Meditrust Fin. Servs.Corp. v. Sterling Chemicals, Inc.*, 168 F. 3d 211, 213 (5th Cir. 1999) (citing *Urbano v. Continental Airlines, Inc.*, 138 F. 3d 204, 205 (5th Cir. 1998). Summary judgment is appropriate only when, viewing the evidence in light most favorable to the nonmoving party, no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law.

*Id.* (citing *Celotex Corp. v. Catrett,* 477 U.S. 371, 322-24 (1986); Fed. R. Civ. P. 56(c)).

## II.     THE *DAUBERT* STANDARD AND COURTS AS GATEKEEPERS

Expert testimony is admissible under Federal Rule of Evidence 702 where:

> (a) the expert's scientific technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b)the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. has long been interpreted under the standards set forth in the in *Daubert v. Merrel Dow Pharmaceuticals, Inc.*, which provides non-exclusive factors for courts to use in determining the reliability of expert testimony: (1) whether the expert's theory can be or has been tested, (2) whether the theory has been subject to peer review and publication, (3) the known or potential rate of error of a technique or theory when applied, (4) the existence and maintenance of standards and controls, and (5) the degree to which the technique or theory has been generally accepted in the scientific community. *Knight v. Kirby Inland Marine,* 482 F.3d 347, 354 (5th Cir. 2007).

The Supreme Court in *Daubert* explained that courts are gatekeepers, requiring a "preliminary assessment of whether a proposed expert's reasoning or methodology "is scientifically valid" as applied to the facts at issue. *Daubert*, 509

U.S. at 592-93. As this Court has held, "[a]s a general rule, questions related to the bases and sources of an expert's opinion affect the *weight* to be assigned that opinion rather than its *ability* and *should be left for the jury's consideration*." *U.S. v. 14.38 Acres of Land, More or Less Situated in Leflore Cnty., State of Miss.*, 80 F.3d 1074, 1077 (5th Cir. 1996)(emphasis added).

Courts within this Circuit have explained the difference between the judicial gatekeeping function and the fact-finding function regarding the reliability of expert opinions:

> It must be emphasized, however, that the Daubert inquiry into "reliability" is separate and distinct from the ultimate issue for the jury's consideration, i.e. whether plaintiffs have submitted sufficiently "reliable" proof to permit them to satisfy their burden of proof in a particular case. There is sufficient similarity between the Daubert inquiry and a jury's inquiry that a real danger exists that a court will conflate the two and, thereby, improperly assume the factfinder role which is appropriately reserved for the jury.
>
> Juries decide, on a daily basis, that a particular litigant's proof (including his expert testimony) on a specific issue is not "reliable" in the sense of being persuasive and worthy of credence. This is not a breakdown of the civil justice system; it *is* the civil justice system. The fact that a jury might ultimately decide that a particular expert's testimony is unreliable does not mean, however, that a court acted improperly in permitting the jury to consider that testimony in the first place. **This court's proper inquiry in the Daubert context is whether the expert's testimony is so lacking in reliability as to preclude that expert from even presenting his testimony to the jury. This is, very clearly, a different issue than the ultimate issue for the jury, and this court must be careful not to confuse the two**.

*Person v. Ford Motor Co.*, No. 09-133, 2011 WL 10501606 at *3 (N.D. Miss. Oct. 13, 2011)(bold added, italics in original).

In considering the opinions of causation experts, courts within this circuit have found that "courts do not require a mathematically precise table equating levels of exposure with levels of harm." *Harrison v. BP Expl. & Prod. Inc*., No. 17-4346, 2022 WL 2390733 at \*6 (E.D. La. July 1, 2022). As this Court has also held, "[w]here an expert otherwise reliably utilizes scientific methods to reach a conclusion, lack of textual support may go to the *weight* and *not the admissibility* of the expert's testimony." *Knight v. Kirby Inland Marine,* 482 F.3d 347, 354 (5th Cir. 2007)(emphasis added). Thus, the court's role as a gatekeeper of admissible expert testimony should not rely on the adjudication of the correctness or sufficiency of testimony, as that is a role for the finder of fact in giving weight to such testimony.

This Court *in Knight v. Kirby Inland Marine* explained that:

> We are mindful that under Daubert and FED. R. EVID. 702, a district court has broad discretion to determine whether a body of evidence relied upon by an expert is sufficient to support that expert's opinion. **We also understand that in epidemiology hardly any study is ever conclusive, and we do not suggest that an expert must back his or her opinion with published studies that unequivocally support his or her conclusions.** Where an expert otherwise reliably utilizes scientific methods to reach a conclusion, **lack of textual support may go to the weight and not the admissibility of the expert's testimony**.

*Knight*, 482 F.3d at 354 (5th Cir. 2007) (internal citations omitted)(emphasis added). The fact that epidemiological studies have limitations does not warrant complete exclusion of expert opinions, because all studies have limitations. Further, as this

Court has noted, any alleged issues regarding textual support should go to the *weight* of the expert's testimony, *not* its *admissibility*.

### III.    THE DISTRICT COURT ABUSED ITS DISCRETION IN EXCLUDEING CAUSATION TESTIMONY OF DRS. FREEMAN AND FRENCH WITHOUT HOLDING A *DAUBERT* HEARING.

While the District Court generally has discretion whether to hold a *Daubert* hearing, it erroneously assessed the evidence regarding causation on the papers, and that erroneous assessment could have been avoided if the *Daubert* Hearing requested by DuFour had occurred. Many of the issues discussed above could have been explained to the District Court should a Daubert hearing had occurred.

### A. Standard for Granting Daubert Hearings

Federal Rule of Evidence 104(c) states that hearings on preliminary matters are within the Court's discretion and may be granted "when the interests of justice require." FED. R. EVID. 104(c).   "Whether a Daubert hearing is necessary is a decision within the sound discretion of a district court." *Carlson v. Bioremedi Therapeutic Sys. Inc.*, 822 F.3d 194, 201 (5th Cir. 2016). However, it is "standard practice" that "any challenge to a designated expert's ability to testify should be resolved in a Daubert hearing." *Beau Rivage Resorts, Inc. v. Bel-Aire Prods. Inc.*, No. 1-07CV49, 2010 WL 579937 at \*1 (S.D. Miss. Feb. 12, 2010).

As this Court has concluded, determination regarding the admissibility of expert witnesses "*often benefits from a hearing* and resulting factfinding, especially in complex areas." *Sanger Ins. Agency v. HUB Int'l Ltd*., 802 F.3d 732,747 (5th Cir. 2015)(emphasis added).

Indeed, the intricacy and significance of testimony of an expert's opinion has been considered by courts within this circuit when determining whether to hold a *Daubert* Hearing: "Considering the complexity and importance of their proposed testimony, the court concludes that a formal Daubert hearing should be held regarding the testimony of [these experts] before a final ruling on the admissibility of their testimony is made." *Person*, 2011 WL 10501606 at \*3.

Additionally, the leading commentators note that:

> the trial court may conclude that extensive evidentiary hearings are the most efficacious way for the court to inform itself about the factors it will have to take into account in ruling on admissibility.

Margaret A. Berger, *The Admissibility of Expert Testimony*, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 29 (Fed. Jud. Ctr. 2d ed. 2000).

When the issue is of a "highly technical nature … a final ruling on this issue is best deferred until the court can hold a formal *Daubert* hearing." *Person* 2011 WL 10501606 at \*7.

17

**B. This complex case required a Daubert hearing regarding the expert opinions on causation.**

This case is a scientifically complex toxic tort Multi-District Litigation case that requires technical opinions regarding causation of DuFour's illnesses that stem from his exposure to harmful chemicals. It is within the interests of justice to make sure that each plaintiff has an ample opportunity to prove his case. Here, the District Court erred in ruling on the BP Defendants' motions based on alleged "familiarity with the issues raised." ROA. 9632.

However, these issues as to DuFour specifically were raised for the first time in this case. Any alleged "familiarity" on which the court may be relying would be regarding *different* plaintiffs, experts, opinions, and underlying studies presented to the court by DuFour. For example, the main asthma study relied upon by Dr. Freeman (the Lawrence 2022 Study), had been published only a few months prior. ROA. 8681-8689.

By relying on alleged familiarities of *other* cases, the District Court denied DuFour of the opportunity to have *his experts* be heard to justify the findings in their reports through live testimony. The District Court had an opportunity to come to a fully informed decision considering the admission of DuFour's expert witnesses and their testimony. Instead, the District Court relied on its own assumptions regarding DuFour's expert opinions and underlying studies on which the experts relied to

exclude the causation opinions and ultimately dismiss all claims of Plaintiff—all without a hearing.

For example, the District Court excluded Dr. Freeman on the basis that his reports were "rife with *ipse dixit* statements" and that Dr. Freeman "simply left too great an analytical gap between the data and the causation opinion proffered." ROA. 9640, 9645. The District Court found certain limitations with the studies on which Dr. Freeman relied, but denied Dr. Freeman the chance to address the Court's concerns at a live *Daubert* hearing. The Court erroneously found it "left with Dr. Freeman's own statements and the [s]tudy itself." ROA. 9644.

Nevertheless, Dr. Freeman *did* address limitations within the studies he relied on in his report, explaining that he took the limitations into consideration and compared those studies with additional studies that did not include such limitations. *See* ROA. 2516-2517. Dr. Freeman additionally addressed limitations within the studies in his deposition testimony, specifically explaining topics with which the Court took issue in its ruling, such as self-diagnosis of symptoms. *See, e.g.,* ROA. 2839-2840, 2849, 2856, 2860.

However, these are issues about which the Court could have inquired at a *Daubert* Hearing. Dr. Freeman could have addressed the alleged lack of explanation

that the District Court found in his report via his live testimony at a Daubert Hearing

which is the "standard practice."

A *Daubert* evidentiary hearing can provide the proponent of expert testimony

the "opportunity to present additional evidence to meet their burden of showing that

the opinion was based on more than the *ipse dixit* of the expert." *Lee-Bolton v.*

*Koppers Inc.*, 319 F.R.D. 346, 377 n.77 (N.D. Fla. 2017). A *Daubert* Hearing was

the only opportunity that DuFour's experts had to cure any alleged gaps that the

District Court seemed to find in the reports, and the Court should have given the

opportunity to do so.

## IV. **THE DISTRICT COURT ABUSED ITS DISCRETION IN EXCLUDING THE EXPERT TESTIMONY OF DR. FREEMAN.**

### A. *The District Court went beyond its gatekeeping function in its assessment of the studies relied upon by Dr. Freeman.*

Dr. Freeman established a statistically significant positive association in the

literature through a review of a variety of occupational exposure studies related to

chemical exposure and asthma. ROA. 2492-2526, 2576-2592. The District Court

abused its discretion in excluding Dr. Freeman as an expert, as it went beyond its

function as a gatekeeper in assessing only the limitations of the studies relied upon

by Dr. Freeman. The District Court focused only on the limitations of the studies,

accusing Dr. Freeman of "cherry-picking" information from the studies, but Dr.

Freeman acknowledged and considered the study limitations, finding they were not

strong enough to exclude the study, as the strengths of the study outweighed the weaknesses. Dr. Freeman addressed questions about the limitations within the studies in his deposition. *See* ROA. 2839-2840, 2849, 2856, 2860.

The District Court excluded Dr. Freeman based almost exclusively on its analysis of the underlying studies relied upon by Dr. Freeman. While citing disclaimers made in each study to find that the studies are unreliable and inapplicable, the District Court failed to consider the merits of the studies whatsoever. As previously noted, the fact that epidemiological studies have limitations does not warrant complete exclusion of expert opinions, because all studies have limitations.

Additionally, the Court failed to consider that Dr. Freeman acknowledged and considered these studies' limitations when rendering his causal opinion, but still found that the strengths of the studies outweighed the limitations. *See* ROA. 2516-2517, 2577. Dr. Freeman conducted an analysis of the strengths and limitations of the studies, and the District Court should not have supplemented its own opinion for Dr. Freeman's in excluding him as an expert.

Here, the District Court's assessment of the weight of the usefulness of the study goes beyond the requirements to determine its reliability. In *Pipitone v. Biomatrix, Inc*., this Court reversed the exclusion of an expert epidemiologist,

explaining that "the standard of reliability that the district court applied to [the expert's] testimony was overly stringent." 288 F.3d 239, 250 (5th Cir. 2002). In *Pipitone*, the District Court excluded the expert epidemiologist Dr. Coco who was offering critical causation testimony regarding the Plaintiff's contraction of salmonella. *See id* at 248-49. However, this Circuit found that the District Court went beyond its duty as a gatekeeper when it applied its own analysis of the applicability of Dr. Coco's testimony to the facts at issue and reversed the exclusion of Dr. Coco. *Id.* at 249-50. This Court explained that:

> It bears reminding that the **trial court's role as gatekeeper under *Daubert* is not intended to serve as a replacement for the adversary system**. Rather, as *Daubert* makes clear, vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence. Thus, while exercising its role as a gate-keeper, a trial court must take care to not transform a *Daubert* hearing into a trial on the merits. In this case, we conclude that the standard of reliability that the district court applied to Dr. Coco's testimony was overly stringent. **The fact-finder is entitled to hear Dr. Coco's testimony and decide whether it should accept or reject that testimony after considering all factors that weigh on credibility**.

> Id. at 250.

That is the case here, where the District Court's assessment of the studies relied upon by Dr. Freeman was beyond that of scientific reliability and instead focused on the proof required to prove causation, which is the job of the jury. Indeed, the District Court in this case went even further than that of the trial court in *Pipitone*,

as the District Court here did not even allow a *Daubert* hearing before excluding

DuFour's experts. The Court's role is *not* to supplement or supplant its own opinion

for that of DuFour's experts. The District Court failed to consider the totality of Dr.

Freeman's testimony, instead conducting its own biased analysis of the

epidemiological studies that Dr. Freeman relies on.

As this Court is well aware, "scientific inference typically requires the

consideration of numerous findings, which, when considered alone, may not

individually prove the contention." Berger, supra. This Court has held some

extrapolations based on existing science are permissible. *See Johnson v. Arkema,*

*Inc.*, 685 F.3d 452 (5th Cir. 2012) ("Our review of Supreme Court and this circuit's

case law confirms that, in forming a reliable opinion regarding the effects of

exposure to a particular chemical, an expert may extrapolate data from studies of

similar chemicals.").

Indeed,

[a]nalytical gaps do not take [the opinion] out of the realm of substantive
evidence … Rather the 'gaps' go to the weight of the evidence, which the
jury [is] free to balance.

*Wackman v. Rubsamen*, 602 F.3d 391, 403 (5th Cir. 2010) (citing *Viterbo v. Dow*

*Chem. Co*., 826 F.2d 420, 422 (5th Cir. 1987)).

23

Here, the District Court excluded Dr. Freeman based on alleged "analytical gaps" and insignificant criticisms of the underlying studies on what Dr. Freeman relied. Dr. Freeman employs a reliable method, and any limitations of the studies relied upon go to the *weight* of Dr. Freeman's testimony, not the *admissibility*, where Defendants will have every opportunity to cross-examine Dr. Freeman on those limitations before the fact finder. The District Court abused its discretion in overstepping its function as a gatekeeper and instead stripping the jury of the chance to hear Dr. Freeman's testimony and weigh it for themselves.

### i.     The Lawrence Study

The Lawrence 2022 study is one of the strongest studies to date establishing a connection between Deepwater Horizon exposures to oil spill response workers and increased asthma risks. The exposure assessment methods used in the study "are consistent with state-of-the-art industrial hygiene approaches and the amount of exposure monitoring data used to inform estimates is unprecedented." ROA.  8681-8689. The Lawrence Study found that there was a statistically significant elevated risk of asthma associated with numerous indices of BP Oil Spill exposure, including a 60% increase in the risk of oil spill cleanup workers developing asthma when compared to the non-exposed control group. ROA. 8930. The authors of the Lawrence Study found that "working on the oil spill cleanup effort in any capacity was associated with a higher risk of incident asthma." ROA.  8933.  These findings

were based on a 95% confidence intervals between spill-related exposures and asthma. ROA. 8682.

The District Court determined that the Lawrence Study was unreliable because of (1) possible misclassification of asthma due to the inclusion of self-reporting asthma symptoms, (2) a statement that in previous analyses, asthma defined only by a physician's diagnosis and not self-reporting lacked an exposure-response association, and (3) the exclusion of participants with previously reported asthma diagnoses. However, all these alleged limitations *do not* go to the reliability of the entire study, but instead to the weight of Dr. Freeman's objective view on that the study as decided by the jury, especially where Dr. Freeman considered and weighed these limitations himself. Dr. Freeman specifically noted that the study limitation "fail to explain the findings described by the authors, however, including trend for exposure." ROA. 2578.  None of these reasons make the study and thus Dr. Freeman's opinions based on the study "so lacking in reliability as to preclude that expert from even presenting his testimony to the jury." *Person*, 2011 WL 10501606 at *3.

Instead, these restrictions, identified by the authors themselves, are explanations of *why* this specific analysis was done in the Lawrence 2022 Study, by comparing the issues of previous analyses with the diagnoses and reports of asthma

used in this analysis. For example, the self-reporting of asthma was used in part

because

> asthma incidence based on a physician's diagnosis would
> underestimate the true asthma incidence, given this cohort's limited
> access to healthcare and likely differential access among participants to
> that care.

ROA. 8935.

What the District Court ignored completely were the *strengths* of the

Lawrence Study, including Dr. Freeman's balancing of the study's strengths and

weaknesses. For example, the study focuses on the complex mixtures of chemicals

to which oil spill response workers were exposed, as opposed to one single pollutant

model which is not practical in assessing the harm done by this disaster. The authors

explained that:

> Assessment of health effects related to mixtures has been identified as
> being crucial in understanding realistic exposure scenarios given the
> oftentimes high correlation chemicals in the environment or workplace; it
> is thought to identify risk factors more accurately for diseases with
> environmental origins and single pollutant models can be misleading.

ROA. 8935.

Dr. Freeman further explains this strength in his Supplemental Report:

> A major strength of this study was that it estimated relationships
> between asthma risk and a BTEX-H mixture. Assessment of health
> effects related to mixtures has been identified as being crucial in
> understanding realistic exposure scenarios given the often-high
> correlation chemicals in the environment or workplace. Other study
> strengths included the large study sample size, the use of air monitoring

data at the time of exposure, and asthma characterization evaluated as
incidence versus prevalence.

ROA. 2577-78.

The District Court failed to even note these study strengths as explained by Dr.

Freeman, and additionally ignored Dr. Freeman's opinions that the possible

limitations of the study did not affect the conclusions of the study authors. The

District Court's analysis of the Lawrence Study is one-sided and fails to

acknowledge that all epidemiological studies have limitations. Instead of

considering the entirety of the study to in evaluating Dr. Freeman's opinions, the

District Court improperly weighed select characteristics of the study.

### ii.    The NIOSH Data

The National Institute for Occupational Safety and Health (NIOSH) collected

data as a part of a health hazard evaluation (HHE) to investigate potential hazards

associated with the BP response work activities. The District Court criticized Dr.

Freeman's use of this data because it focused on self-reported acute symptoms of

asthma. However, the Court improperly bases its decision on a small variation in

collected data as compared to the specific characteristics of the injury and harm

suffered by DuFour.

Essentially, the court narrowly focused on the difference between acute

symptoms of asthma and the chronic disease of asthma. But, these differences go to

the *weight* that the data should be given—*not* the *admissibility*. All chronic disease starts as acute symptoms, and it is scientifically reasonable, and consistent with peer-reviewed science, to draw conclusions about chronic disease based on self-reported acute symptoms. *See* The Lawrence Study 2022 at ROA. 8681-8689. The District Court's reasons for finding that the NIOSH data was unreliably used by Dr. Freeman are immaterial to the *admissibility* of Dr. Freemans expert testimony and should instead be heard and *weighed* by the trier of fact.

### B. The District Court applied an inflated standard for causation.

Dr. Freeman is a consultant in the fields of forensic medicine and forensic epidemiology, in both of which he holds doctoral degrees. ROA. 8614. Dr. Freeman has served as an associate editor or editorial board member of fifteen (15) scientific peer-reviewed journals and has published approximately two-hundred and thirty (230) scientific papers, abstracts, book chapters and books that have been cited by other authors of peer-reviewed publications approximately four-thousand (4,000) times. In excluding Dr. Freeman as an expert on causation in this case, the District Court erroneously found that Dr. Freeman's opinions on general and specific causation were insufficient to satisfy the element of legal causation despite his extensive qualifications as an epidemiological expert.

It is undisputed that in a BELO suit, the plaintiff must prove legal causation. MSA § VIII(G)(3)(a)(iv). *Plancun v. BP Expl. & Prod., Inc.*, No. 15-2963, 2016 WL 7187946 at * 7 (E.D. La. Dec. 12, 2016). The Bradford-Hill criteria include nine viewpoints by which to evaluate human epidemiologic evidence to determine if causation can be deduced: (1) strength of association; (2) consistency; (3) specificity; (4) temporality; (5) biological gradient (known as dose-response); (6) biologic plausibility; (7) coherence; (8) experiment; and (9) *analogy*. Austin Bradford Hill, *The Environment and Disease: Association or Causation*. Proc. Roy. Soc. Med. 58 295, 299 (1965). These criteria are guidelines, *not* strict rules.

Here, the District Court conflated the required causation standard between *general* and *specific* causation in its analysis of Dr. Freeman's application of the Bradford Hill factors and the implementation of a dosage debate regarding the causation requirement of level of exposure. ROA.  9638-9642. The dose-response criteria under Bradford-Hill does not require a specific dose-threshold to make a causal conclusion.

Additionally, in excluding Dr. Freeman, the District Court stated that the studies he on which he relied in his report "do not address the same exposure scenario that DuFour experienced." ROA.  9639. However, one study relied upon by Dr. Freeman – the Lawrence Study – specifically studies Deepwater Horizon clean up workers and their development of asthma.

The District Court stated that none of the studies that Dr. Freeman relies on "appear to address the specific worsening of preexisting chronic asthma that is the central issue in Dufour's case." ROA. 9642. This analysis is illogical—the District Court excluded Dr. Freeman because he relied on a study that focused on the *development* of asthma in Deepwater Horizon clean-up workers instead of the *worsening* of asthma in Deepwater Horizon clean-up workers. It is far beyond the gatekeeping function of a court to completely exclude an expert based on an argument that clean-up workers can develop asthma from exposure to chemicals, but that the same exposure to such chemicals cannot worsen an already-developed case of asthma.

Because of this case's complexity, specifically the mixture and additive effects of different toxicants in crude oil and COREXIT, coupled with the uncertain chemical concentrations of exposure due to flawed or incomplete monitoring data on the part of BP, the District Court should have provided more flexible consideration of the available studies. Instead, the District Court applied a rigid causation standard to exclude Dr. Freeman that required him to apply only epidemiological studies that identify the *exact* same exposures as DuFour, which is arbitrary and nearly impossible in the face of this disaster. Additionally, not only is this inconsistent with the Bradford Hill criteria, which specifically calls for

"analogy" between various studies, but it also ignores the Lawrence Study – a study evaluating Deepwater Horizon cleanup workers and the development of asthma.

While the District Court relies on *Allen v. Pennsylvania Engineering Corp.* for the concept that legal causation must include scientific knowledge of a "harmful level of exposure to a chemical" to be paired with "knowledge that the plaintiff was exposed to such quantities," nowhere in *Allen* does the Court state that there is no causation without the identification of a precise quantifiable dose of exposure. 102 F.3d 194 (5th Cir. 1996). Instead, Dr. Freeman relies on studies like the Lawrence Study, that were actually "based on air monitoring data at the time of exposure, which improves upon exposure definitions found in other oil spill studies." ROA. 8935. Such monitoring shows the harmful level of exposure to the mixture of chemicals for oil spill cleanup workers, especially considering the data was taken at the time of exposure, making it an on-point representation of exposure. Given that DuFour was an oil spill clean up worker, there is clear knowledge that such data would apply to his own exposure.

Further, Dr. Freeman's reliance on the NIOSH data establishes a harmful level of exposure in analyzing the days of exposure to the actual mixture of chemicals in this specific oil spill. Dr. Freeman is the first expert in the BP litigation to use this data to represent a harmful level, and there is a statistically clear threshold where cleanup workers begin to present with adverse effects due to their exposure.

31

While the District Court erroneously found that Dr. Freeman's opinions regarding general causation were not reliable because they did not "address the same exposure scenario that DuFour experienced," that is not the standard required. As Judge Barbier of the Eastern District of Louisiana stated,

> The general causation inquiry in toxic tort cases is not limited to environmental sampling data taken as part of the incident at issue. Instead, an expert may consult *all* relevant scientific and medical literature on the harmful effects of the chemicals at issue to determine whether a relevant chemical has the capacity to cause the harm alleged by the plaintiff in the general population.

*See* Order, *In re: Deepwater Horizon B-3 cases*, No. 17-03188, Doc. 63 (E.D.La. Oct. 12, 2022).

Dr. Freeman followed this inquiry laid out by Judge Barbier by interpreting the relevant scientific and medical literature on the causation between relevant chemicals and asthma and applying his analysis to DuFour.

Where the District Court's determination is to exclude an expert as unreliable, it must make such decisions only where it falls outside of the range where experts might reasonably differ. *Kumho Tire Co. v. Carmichael*, 546 U.S. 137, 150 (1999). Additionally, "the jury must decide among the conflicting views of different experts, even though the evidence is 'shaky.'" *Id*. The District Court erroneously and inappropriately applied a one-sided analysis to find that Dr. Freeman's evidence of the exposure-disease relationship was "shaky," but even if "shaky," the jury has the obligation to decide the limits of experts, not the Court. Dr. Freeman's opinions do

not rise to the level of falling outside the range where experts might reasonably differ, and thus the District Court should not have excluded Dr. Freeman. Dr. Freeman's analysis of causation between DuFour's exposure to the various chemicals and the worsening of his asthma is grounded in strong, newly published, and peer-reviewed studies.  Thus, even if the District Court did feel that Dr. Freeman's opinions were "shaky," evaluation of such is a decision to be made by the *jury*, not by the Court.

## V.     THE DISTRICT COURT ABUSED ITS DISCRETION IN EXCLUDING DR. FRENCH'S TESTIMONY REGARDING CAUSATION OF HIS PATIENT'S CONDITION AS PLAINTIFF'S TREATING PHYSICIAN.

The District Court erred in excluding the causation testimony of Dr. French because, as DuFour's physician, Dr. French can testify as an expert without submitting a written expert report. Dr. French may offer testimony as a non-retained expert witness based on his personal observations while treating DuFour under Federal Rule of Evidence 703 which provides:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of **or personally observed**. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

FED. R. EVID. 703. (emphasis added).

The requirements for disclosing expert opinions are governed by Federal Rule of Civil Procedure 26. Courts within this Circuit have held that:

> although retained experts are required to provide an expert report, per Rule 26,… **a treating physician may testify as a non-retained expert witness – and therefore need not provide an expert report.** When a non-retained expert treating physician does not provide an expert report, his testimony must remain confined to facts disclosed during the care and treatment of the patient, **including** his diagnosis, **the causation of the plaintiff's injuries**, and the plaintiff's prognosis, as long as the doctor formed those opinions based on his personal knowledge and observations obtained during the course of care and treatment.

*James v. Antarctic Mechanical Servs., Inc.*, No. 18-678, 2020 WL 1339640 at *3 (S.D. Miss. 3/23/2020) (internal quotations omitted)(emphasis added) (finding that a treating physician's evidentiary basis for his opinion was created in the context of treatment, as acknowledged in his deposition).

Thus, an expert report need not be provided under Rule 26 for a *treating* physician to opine on the *causation* of plaintiff's injury when the doctor formed those opinions based on his personal knowledge and observations during the course of care. It is where a treating physician relies on sources outside of those utilized during treatment that courts have found an expert report is required. *See id*.

Indeed, the Southern District of Mississippi Local Uniform Rule 26(a)(2)(D) provides that an expert is *not* required to produce an expert report where a party designates physicians "who are not retained or specially employed to provide expert testimony but are expected to be called to offer expert opinions at trial." *See* Loc. Unif. Civ. R. S.D. Miss. 26(a)(2)(D). In that instance, "[n]o written report is required

from such witnesses" as long as the subject matter of the opinion and a summary of facts and opinions on which the expert is to testify is disclosed. *Id*.   Here, such disclosures were adequately made of Dr. French. ROA.  3757.

The District Court erroneously excluded the causation opinions of Dr. French that were not physically contained in DuFour's medical records. ROA. 9622. However, a treating physician is allowed to offer an expert opinion, including an expert opinion on *causation*, "as long as the doctor formed those opinions based on his personal knowledge and observations obtained during the course of care and treatment." *James*, 2020 WL 1339640 at *3.   Thus, as long as the treating physician does not rely on outside sources, his opinion is admissible. Here, Dr. French testified in his deposition that he considers the potential causes of diagnosis of his patients, and that he continuously evaluated and diagnosed the causation of chronic symptoms of DuFour *during treatment*. ROA.  6029, 6060-6061.

Courts within this circuit have noted that "courts have held that a treating physician may rely upon their ordinary medical training to opine on the *causation* of an injury." *Cantu v. Wayne Wilkens Trucking, LLC*, No. 19-7067, 487 F.Supp.3d 578 (W.D. Tex. Sept. 16, 2020)(emphasis added). Here, Dr. French relied on his ordinary medical training to opine on the causation of DuFour's chronic respiratory condition in the regular course of his treatment, of which Dr. French had personal knowledge as DuFour's treating physician.

Moreover, this Court has noted that whether a physician needs to produce a written expert report on "opinions that the treating physician arrives at after treatment, for the purposes of litigation. . . remains *unsettled* in this circuit." *U.S. v. Williams*, No. 20-10433 (5th Cir. 2021), 2021 WL 2819016 (emphasis added). Thus, even if the opinions of Dr. French fall outside of his contemporaneous diagnosis and treatment of DuFour, which they do not, this Circuit has not set a precedent that requires Courts to exclude the opinions of a treating physician outside of the four corners of their medical records and should not create such a precedent in this case.

Instead, the causation opinions of treating physician Dr. French should be heard and evaluated by the finder of fact who must assess the weight and credibility of Dr. French's opinions on causation. As a court in this circuit explained when assessing a similar situation,

> Defendants' arguments against the admissibility of [treating physician's] causation opinion are better taken as attacks on the weight that should be afforded his testimony for a jury, not the Court, to determine. [Treating physician] will be permitted to provide his causation opinion that was formed in the course of his treatment of Plaintiff.

*Perez v. Boecken*, No. 19-00375, 2020 WL 3074420, *8 (W.D. Tex June 10, 2020).

The exclusion of treating physician Dr. French's causation testimony prejudiced DuFour greatly, as the District Court did not allow Dr. French the opportunity to explain how he arrived at his opinions on causation during DuFour's treatment. The District Court abused its discretion in going beyond its gatekeeping

function in ruling on a question for the jury. Further, it did so without allowing Dr. French to testify at a *Daubert* hearing. Thus, this Court must reverse the District Court's exclusion of Dr. French's testimony regarding the causation of his patient DuFour's diagnosis because such opinions are based on Dr. French's personal knowledge and opinions formed during his treatment of DuFour.

## VI. THE DISTRICT COURT ERRED WHEN IT GRANTED SUMMARY JUDGMENT AND DISMISSED DUFOUR'S CASE.

As stated above, the District Court erred in excluding DuFour's expert epidemiologist Dr. Freeman and causation testimony of DuFour's treating physician Dr. French. As a result of this causation testimony of the doctors being excluded, the District Court dismissed DuFour's claims in their entirety on the basis of lack of evidence of the essential element of causation.

The District Court's erroneous exclusion of both DuFour's causation experts was crucial to the dismissal of  DuFour's claims. Without an expert, DuFour could not prove the central issue in this litigation—the level, extent, and duration of his exposure to harmful substances during the relevant times of the Oil Spill.

DuFour was required to prove the following factors as to legal causation: (1) the scientific knowledge of the harmful level of exposure to a particular chemical, and (2) that he was exposed to such quantities.  *Seaman v. Seacor Marine, LLC*, 326

F. App'x 721, 723 (5th Cir. 2009) (citing *Allen v. Penn. Eng'g. Corp.*, 102 F. 3d 194, 199 (5th Cir. 1996).

Because the District Court improperly excluded DuFour's expert witness testimony regarding causation, it found DuFour was unable to provide any evidence as to the essential element of causation. Had the District Court not excluded DuFour's witnesses, DuFour would have been able to present testimony regarding causation to the trier of fact. This testimony would have allowed DuFour to demonstrate that there was a genuine issue of material fact, defeating summary judgment, as he would have expert epidemiologist testimony and testimony from his treating physician to have been able to present to the jury for it to make the determination of causation based on their weighing of the evidence and evaluating the credibility of the witnesses through their demeanor at trial. As such, this Court should reverse the summary judgment.

## CONCLUSION

This Court should reverse the Judgment dismissing DuFour's claims against the BP Defendants.  The District Court improperly excluded Drs. Freeman and. French without a *Daubert* Hearing as requested by Plaintiff. Further, the District Court erroneously applied an insurmountable and arbitrary standard regarding Dr. Freeman's expert opinion on the required level of exposure and improperly assessed the underlying studies upon which he relied, thus exceeding its judicial gatekeeping

function. The District Court also erroneously excluded the causation testimony of DuFour's treating physician Dr. French that should have been assessed and weighed by the trier of fact.

As a result of the District Court's improper exclusion of this testimony, the District Court also erred when it issued Summary Judgment dismissing DuFour's case in its entirety. This Court should reverse the District Court's Judgment excluding Dr. Freeman, excluding the causation testimony of Dr. French, and granting Summary Judgment.

Respectfully submitted,

*S/ Martha Y. Curtis*

_____

MARTHA Y. CURTIS (#20446)
HANNAH L. BREWTON (#40178)
**SHER GARNER CAHILL RICHTER KLEIN & HILBERT, L.L.C.**
909 Poydras Street, Suite 3800
New Orleans, Louisiana 70112-4046
Telephone: (504) 299-2100
Facsimile: (504) 299-2300

**ATTORNEYS OF RECORD FOR APPELLANT RICHARD ALLEN DUFOUR, JR.**

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that the foregoing instrument has been served via the Court's ECF filing system in compliance with Rule 25(b) and (c) of the Federal Rules of Appellate Procedure, on October 12, 2023, on all registered counsel of record, and has been transmitted to the Clerk of the Court.

*S/ Martha Y. Curtis*

_____

**MARTHA Y. CURTIS**
**ATTORNEY OF RECORD FOR**
**RICHARD ALLEN DUFOUR, JR.**

## **CERTIFICATE OF COMPLIANCE**

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 8,782 words as determined by the word-count function of Microsoft Word 2013, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Fifth Circuit Rule 32.2.

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in Times New Roman font, 14-point type face.

*S/ Martha Y. Curtis*

_____

**MARTHA Y. CURTIS**
**ATTORNEY OF RECORD FOR**
**RICHARD ALLEN DUFOUR, JR.**

## <u>CERTIFICATE OF ELECTRONIC COMPLIANCE</u>

I hereby certify that (1) the required privacy redactions, if any, have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.; and (3) the document has been scanned and is free of viruses.

*S/ Martha Y. Curtis*

_____

**MARTHA Y. CURTIS**
**ATTORNEY OF RECORD FOR**
**RICHARD ALLEN DUFOUR, JR.**